UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DWAYNE EDMOND WILSON,

        Petitioner,

v.                                 CASE NO. 2:18-cv-10906
                                 HONORABLE LINDA V. PARKER

LES PARISH,

        Respondent.

_____/

**OPINION AND ORDER (1) DENYING HABEAS CORPUS PETITION
(ECF NO. 1); (2) DENYING MOTION FOR BOND (ECF NO. 15); (3)
DENYING MOTION FOR HEARING (ECF NO. 22); (4) GRANTING THE
MOTION FOR LEAVE TO FILE A SUPPLEMENTAL BRIEF (ECF NO.
23); (5) DENYING MOTION TO EXPEDITE BOND DUE TO
PETITIONER'S MEDICAL CONDITION (ECF NO. 28); AND (6)
DENYING MOTION FOR LEAVE TO BE HEARD ON PENDING BOND
MOTION (ECF NO. 29)**

Petitioner Dwayne Edmond Wilson, a state prisoner in the custody of the

Michigan Department of Corrections, filed an application for writ of habeas corpus

pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)  The pleading challenges Petitioner's

convictions for possession of a firearm during the commission of a felony, Mich.

Comp. Laws § 750.227b, and two counts of unlawful imprisonment, Mich. Comp.

Laws § 750.349b.  The sole ground for relief alleges that Petitioner's Sixth

Amendment right to a speedy trial was violated.

Also pending before the Court are Petitioner's motion for release on bond pending a decision on his habeas petition (ECF No. 15), his motion for a hearing before the Chief Judge of this District as to why the judge formerly assigned to this case recused herself (ECF No. 22), and Petitioner's motion for leave to file a supplemental brief supporting his motion for bond (ECF No. 23).  Respondent Les Parish opposes Petitioner's habeas corpus petition and motion for bond.  (ECF Nos. 5, 18.)  Having reviewed the pleadings and record, the Court concludes that the state appellate court's rejection of Petitioner's claim on the merits was objectively reasonable.  Accordingly, the habeas petition will be denied. Additionally, the motion for bond pending a decision in this case will be denied as moot, the motion for a hearing likewise will be denied, and the motion to file a supplemental brief will be granted.

## I.  Background

### A.  The Charges, First Trial, First Sentence, and First Direct Appeal

On June 12, 2009**,** Petitioner was arraigned in state district court and bound over for trial in Macomb County Circuit Court.   (*See* ECF No. 6-1 at Pg. ID 161.) The felony information (charging document) listed the following crimes:  (i) first-degree, premeditated murder; (ii) felony-murder (murder committed during commission of, or attempt to commit, a felony); (iii) possession of a firearm during the commission of, or attempt to commit, a felony ("felony-firearm"), second

2

offense; (iv) two counts of unlawful imprisonment; (v) first-degree home invasion; (vi) assault with intent to do great bodily harm less than murder; (vii) carrying a dangerous weapon with unlawful intent; and (viii) second-degree murder. (ECF No. 6-14 at Pg. ID 490-91.) On June 22, 2009, Petitioner was arraigned in state circuit court (ECF No. 6-3), and on December 8, 2009, his first trial began (ECF No. 10-1). Before jury selection, the prosecutor dismissed the counts charging Petitioner with second-degree murder and carrying a dangerous weapon with unlawful intent, and the trial court denied Petitioner's motion to represent himself. (ECF No. 10-1 at Pg. ID  3874, 3884-88.)

On December 10, 2009, the jury found Petitioner guilty of (i) second-degree murder, Mich. Comp. Laws § 750.317, as a lesser offense to premeditated murder; (ii) felony-murder, Mich. Comp. Laws § 750.316(1)(b); (iii) felony-firearm, Mich. Comp. Laws § 750.227b; (iv) assault with intent to do great bodily harm less than murder, Mich. Comp. Laws § 750.84; and (v) two counts of unlawful imprisonment, Mich. Comp. Laws § 750.349b. (ECF No. 10-3 at Pg. ID 4190.) The jury acquitted Petitioner of first-degree, premeditated murder and home invasion. (*Id.*)

On January 20, 2010, the trial court sentenced Petitioner to a term of (i) 36 to 60 years in prison for the second-degree murder conviction; (ii) life imprisonment without the possibility of parole for the felony-murder conviction;

3

(iii) five years in prison for the felony-firearm count, with 239 days credit; (iv) five to 10 years in prison for the assault conviction; and (v) five to 15 years for the two unlawful-imprisonment convictions.  (ECF No. 6-7 at Pg. ID 344-45.)  The court ordered the felony-firearm sentence to be served before the other sentences, which ran concurrently with each other.  (*Id*. at Pg. ID 344.)

Petitioner appealed his convictions and sentence through counsel.   Among other things, he argued that the trial court violated his right to represent himself at his trial.  The Michigan Court of Appeals agreed with Petitioner's argument on that issue.  Accordingly, the Court of Appeals vacated Petitioner's convictions and sentences and remanded the case to the trial court for further proceedings.  *People v. Wilson*, No. 296693, 2011 WL 1778729 (Mich. Ct. App. May 10, 2011) (unpublished).  The prosecutor appealed the Court of Appeals' decision, but on September 6, 2011, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issue.  *People v. Wilson*, 490 Mich. 861; 801 N.W.2d 882 (2011).

## B.  The Interlocutory Appeals Before the Second Trial

The prosecutor re-charged Petitioner with (i) felony-murder; (ii) felony-firearm, second offense; (iii) two counts of unlawful imprisonment; (iv) assault with intent to do great bodily harm less than murder; (v) carrying a dangerous weapon with unlawful intent; and (vi) second-degree murder.  (ECF No. 6-23 at

4

Pg. ID 1338-39.)  On December 13, 2011, Petitioner moved to dismiss the felony-murder charge on double jeopardy grounds because the jury had acquitted him of home invasion, which was the only underlying felony for the felony-murder charge.  (*See* ECF No. 6-9 at Pg. ID 357-58.)

On July 6, 2012, the trial court granted Petitioner's motion and dismissed the felony-murder charge on double jeopardy grounds.  The court stated that Petitioner could not "be tried on Felony Murder when the only predicate available is that for which he has already been acquitted."  *People v. Wilson*, No. 09-2637 FC (Macomb Cty. Cir. Ct. July 6, 2012); (ECF No. 6-18 at Pg. ID 671).

Meanwhile, Petitioner argued at a pretrial conference on February 16, 2012, that his right to a speedy trial was being violated.  (ECF No. 6-11 at Pg. ID 383-86.)  The trial court rejected Petitioner's argument (*id.* at Pg. ID 403) and, on April 6, 2012, Petitioner filed a *pro se* interlocutory appeal from the trial court's decision.  (ECF No. 6-16 at Pg. ID 539-50.)  On April 18, 2012, the Michigan Court of Appeals denied Petitioner's application for leave to appeal "for failure to persuade the Court of the need for immediate appellate review."  *People v. Wilson*, No. 309493 (Mich. Ct. App. Apr. 18, 2012); (ECF 6-16 at Pg. ID 537).  Petitioner appealed that ruling to the Michigan Supreme Court but, on May 24, 2013, the state supreme court denied leave to appeal because it was not persuaded to review the issue.  *People v. Wilson*, 494 Mich. 853; 830 N.W.2d 383 (2013).

5

The double jeopardy issue continued to progress on a different track.  On July 12, 2012, the prosecutor filed an interlocutory appeal from the trial court's decision that Petitioner could not be retried on a charge of felony-murder.  On July 16, 2012, the Michigan Court of Appeals stayed the case pending the appeal, and on November 15, 2012, the Court of Appeals reversed the trial court's decision on the double jeopardy issue and reinstated the felony-murder charge.  *People v. Wilson*, No. 311253, 2012 WL 5854885 (Mich. Ct. App. Nov. 15, 2012).

Petitioner appealed that decision to the Michigan Supreme Court.  (ECF No. 6-21 at Pg. ID 1068-96.)  About a year and a half later, on June 18, 2014, the Michigan Supreme Court reversed the Michigan Court of Appeals, dismissed the felony-murder charge, and remanded the case to trial court.  *People v. Wilson*, 496 Mich. 91; 852 N.W.2d 134 (2014).[1]

## C.  The Initial Habeas Petition

On June 25, 2014, Petitioner filed a *pro se* habeas corpus petition in this District.  He argued that he was denied his state and federal rights to a speedy trial and his right to present a defense due to the prosecution's suppression or destruction of evidence.  Former United States District Judge Lawrence P. Zatkoff summarily dismissed the petition without prejudice on July 17, 2014.  Judge

---

[1] Justice Stephen J. Markman filed a dissenting opinion, which Justices Brian K. Zahra and David F. Viviano joined.

Zatkoff stated that the delay in bringing Petitioner to trial was largely due to interlocutory appeals and that the case was expected to be set for trial promptly. Judge Zatkoff also stated that prejudice could not be accurately ascertained until after the trial and that no extraordinary circumstances warranted intrusion into state proceedings already underway. *See Wilson v. Michigan*, No. 14-12490 (E.D. Mich. July 17, 2014).

### D. The Second Trial and Second Sentence

Petitioner subsequently asked the trial court to dismiss his case on speedy grounds. The trial court denied his motion on September 8, 2014 (ECF 6-1 at Pg. ID 202) and, on September 24, 2014, Petitioner's second trial began, with Petitioner representing himself. (ECF No. 7-14 at Pg. ID 1922.)[2] At that point, the charges against Petitioner were (i) second-degree murder, (ii) felony-firearm, (iii) assault with intent to do great bodily harm less than murder, and (iv) two counts of unlawful imprisonment. (*Id.* at Pg. ID 2020-21.)

In one of his previous briefs, Petitioner described the trial testimony and the parties' theories of the case as follows:

> The prosecution alleged that on May 26, 2009, Mr. Wilson entered the home of Katherine Horton. Mr. Wilson and Ms. Horton had been in a romantic relationship for around eight years, with Mr. Wilson living at that residence with Ms. Horton, her two daughters from a prior relationship, . . . and the young son he had with Katherine Horton. Ms. Horton alleged that she and Mr. Wilson had recently ended their

---

[2] An attorney was available to assist Petitioner, if he needed help.

7

relationship, and that Mr. Wilson no longer lived at the house, but Mr. Wilson disputed that he had been kicked out of the house and asserted he entered the house using his own key.

According to the prosecution, once inside the house Mr. Wilson tied up [Ms. Horton's daughters], asking them where their mother was. He then waited inside the house for a period of time until Ms. Horton and Kenyatta Williams returned to the house. Mr. Williams was a man Ms. Horton met on the Internet, and had invited to come live with her from his home in Florida. An altercation ensued when Ms. Horton and Mr. Williams entered the house, with Mr. Williams sustaining fatal gunshot wounds and Ms. Horton alleging that Mr. Wilson assaulted her by striking her with a handgun.

The defense theory in the case was that the handgun went off accidentally during a struggle between Mr. Wilson, Mr. Williams, and Ms. Horton, that Ms. Horton was lying about being assaulted, and lying about the circumstances of the altercation . . . .

Both [girls] testified that around 8:00 am on May 26, they were asleep in their house when they were awakened by Mr. Wilson yelling at them, and pointing guns at them. (T, 9/26/14, 135-136; 218-219). He then tied them up with duct tape, and took them up to the ground floor of the house and sat them on a couch. They testified he paced around the house, looking out of the windows, for around 20 minutes or so until their mother and Mr. Williams arrived at the house. (T, 9/26/14, 159-160; 225-227). They could hear the altercation as it occurred, but were blocked from seeing it by a wall of the house. Neither girl suffered any physical injury during the incident. (T, 9/26/14, 179; 239). Both girls acknowledged that Mr. Wilson told them he would not harm or touch them. (T, 9/26/14, 179, 239-240).

Katherine Horton testified at length as to the incident, and alleged where the respective persons were located at the time Mr. Williams was shot. (T, 9/30/14, 65-75). She stated she and Mr. Williams returned to the house, after dropping off her and Mr. Wilson's young son, who was still living with her, at school sometime between 8:30 am and 9:00 am. (T, 9/30, 63-64). She denied that Mr. Williams was armed with any handgun on that date. Ms. Horton alleged Mr. Wilson hit her with a gun several times on her face and on the back of

8

her head, and was later told at a hospital that she suffered a "slight concussion" and some abrasions.  (T, 9/30/14, 71-72, 89-90).

The medical examiner who did the autopsy on Mr. Williams testified he died from three gunshot wounds, one to his back and two to the back of his shoulder.  (T, 10/1/14, 63-64).  When questioned by Mr. Wilson on cross-examination, the doctor acknowledged that . . . given the location and trajectory of the wounds, the version of the events provided by Ms. Horton in her testimony was physically impossible.  (T, 10/1/14, 92-95, 102-107, 113).  The doctor admitted the wounds were consistent with the gun being pointed downward during a struggle.  (T, 10/1/14, 97-98, 112-113).

Def. Brief on Appeal, Mich. Ct. App. No. 324856 (ECF No. 6-19 at Pg. ID 777-79).

On October 8, 2014, the jury found Petitioner guilty of two counts of unlawful imprisonment and felony-firearm.  (ECF No. 7-23 at Pg. ID 3729-30.) The jury acquitted Petitioner of the more serious charges of second-degree murder and assault with intent to do great bodily harm less than murder.  (*Id*.)

On November 19, 2014, the trial court sentenced Petitioner to 10 years in prison for the felony-firearm conviction, with credit for 1997 days already served, and 100 to 180 months for each conviction of unlawful imprisonment.  The court ordered the sentences for unlawful imprisonment to run concurrently, but consecutive to the felony-firearm sentence.   (ECF No. 6-19 at Pg. ID 762; ECF No. 7-24 at Pg. ID 3834.)

### E.   The Appeal after the Second Trial and the Subsequent Remand

Petitioner appealed his new convictions and sentences.  He argued through counsel that (i) he was denied his constitutional right to a speedy trial; (ii) the trial

court erred in sentencing him to 10 years in prison as a third felony-firearm offender; and (3) he was entitled to re-resentencing on the scoring of the sentencing guidelines for unlawful imprisonment, or the case should be remanded pursuant to *People v. Lockridge,* 498 Mich. 358; 870 N.W.2d 502 (2015), because the trial court used judicial fact-finding to score two offense variables.  (ECF No. 6-19 at Pg. ID 766.)

On May 10, 2016, the Michigan Court of Appeals rejected Petitioner's speedy trial claim on the merits and affirmed his convictions.  The Court of Appeals, nevertheless, agreed with Petitioner that his sentence for the felony-firearm conviction should be five years, not 10 years, and that Petitioner was entitled to reconsideration of his sentence for unlawful imprisonment under *Lockridge,* because there was judicial fact-finding at sentencing.  Accordingly, the Court of Appeals remanded Petitioner's case for correction of the judgment of sentence to reflect a term of five years for the felony-firearm and for reconsideration of Petitioner's sentence for unlawful imprisonment.  *People v. Wilson*, No. 324856, 2016 WL 2731096 (Mich. Ct. App. May 10, 2016) (unpublished).

Both the prosecutor and Petitioner appealed the appellate court's decision. The prosecutor appealed the ruling on the sentence for the felony-firearm conviction, and Petitioner appealed the ruling on the speedy trial issue.  On

10

November 17, 2016, the Michigan Supreme Court denied Petitioner's application to appeal the speedy trial issue because it was not persuaded to review the issue. See *People v. Wilson*, 500 Mich. 890; 886 N.W.2d 710 (2016).

On July 25, 2017, the Michigan Supreme Court issued its decision on Petitioner's sentence. The state supreme court held that Petitioner could be sentenced as a third felony-firearm offender and, therefore, the proper sentence for his felony-firearm conviction was 10 years, not five years. As for the scoring of the sentencing guidelines, the Michigan Supreme Court remanded the case to the trial court for possible re-sentencing under the procedures set forth in *Lockridge*. *See People v. Wilson*, 500 Mich. 521; 902 N.W.2d 378 (2017).

On remand, the trial court held a hearing and declined to re-sentence Petitioner. (ECF No. 7-25 at Pg. ID 3843-44.) Petitioner initially appealed the trial court's decision not to re-sentence him, but he subsequently agreed to dismiss the appeal. (ECF No. 6-20 at Pg. ID 1019.) Thus, on November 15, 2017, the Michigan Court of Appeals dismissed the appeal on stipulation of the parties. *See People v. Wilson*, No. 340322 (Mich. Ct. App. Nov. 15, 2017); (ECF 6-20 at Pg. ID 950). That concluded Petitioner's state case. On March 19, 2018, he filed his current petition for the writ of habeas corpus through counsel.

## II.  Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires prisoners who challenge "a matter 'adjudicated on the merits in State court' to show that the relevant state court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  *Wilson v. Sellers*, 138 S. Ct. 1188, 1191 (2018) (quoting 28 U.S.C. § 2254(d)).  The Supreme Court has explained that

> a state court decision is "contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent."

*Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor,* 529 U.S. 362, 405-406 (2000) (alterations added)).

> "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.,* at 413, 120 S.Ct. 1495.  The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous.  *Id.,* at 410, 412, 120 S.Ct. 1495.  The state court's application of clearly established law must be objectively unreasonable.  *Id.,* at 409, 120 S.Ct. 1495.

*Id.* at 75.

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt[.]'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal and end citations omitted).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Thus, "[o]nly an 'objectively unreasonable' mistake, . . . , one 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement,' slips through the needle's eye of § 2254." *Saulsberry v. Lee*, 937 F.3d 644, 648 (6th Cir.) (quoting *Richter*, 562 U.S. at 103), *cert. denied*, 140 S. Ct. 445 (2019).

## III.  Analysis

Petitioner's sole claim is that he was denied his right to a speedy trial under the Sixth and Fourteenth Amendments to the United States Constitution and that he suffered prejudice as a result.  (Pet., ECF No. 1 at Pg. ID 5.)  The Michigan Court of Appeals was the last state court to adjudicate this claim on the merits.  The Court of Appeals determined that the delay was three years.  (ECF No. 6-23 at Pg. ID 1285.)  The Court of Appeals then analyzed the other relevant factors and concluded that Petitioner's right to a speedy trial was not violated.  In reaching this

conclusion, the Court of Appeals stated that:  (i) prejudice was presumed because the delay exceeded eighteen months; (ii) the majority of the delay, approximately two years, was attributable to the interlocutory appeal arising from the trial court's dismissal of the felony-murder charge, and the delay did not weigh in Petitioner's favor; (iii) Petitioner asserted his right to a speedy trial; and (iv) he suffered no prejudice from the delay.  *Wilson*, 2016 WL 2731096, at *3-6; (ECF No. 6-23 at Pg. ID 1285-88).

## A.  Clearly Established Supreme Court Precedent

The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."  U.S. CONST. amend. VI.  This right "is 'fundamental' and is imposed by the Due Process Clause of the Fourteenth Amendment on the States."  *Barker v. Wingo*, 407 U.S. 514, 515 (1972).

When analyzing a speedy trial claim, courts must weigh the conduct of both the prosecution and the defendant and then apply a balancing test.  *Id.* at 530. Some of the factors which courts should assess in determining whether a defendant was deprived of the right to a speedy trial are the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.*  Stated differently, there are four relevant inquiries:  "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more

to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." *Doggett v. United States*, 505 U.S. 647, 651-52 (1992).

None of these four factors is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.  Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Barker*, 407 U.S. at 533.

"[P]retrial delay is often both inevitable and wholly justifiable."  *Doggett*, 505 U.S. at 656.  Accordingly, "[w]hen the government prosecutes a case with reasonable diligence, a defendant who cannot demonstrate how his defense was prejudiced with specificity will not make out a speedy trial claim no matter how great the ensuing delay."  *United States v. Howard*, 218 F.3d 556, 564 (6th Cir. 2000) (citing *Doggett*, 505 U.S. at 656).

## B.  Application of the Four *Barker* Factors

### 1.  Length of the Delay

"The length of the delay is to some extent a triggering mechanism.  Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."  *Barker*, 407 U.S. at 530. "[T]he length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case."  *Id*. at 530-31.

In this Circuit, "[a] one-year delay is presumptively prejudicial and triggers analysis of the remaining *Barker* factors." *Brown v. Romanowski*, 845 F.3d 703, 714 (6th Cir. 2017) (citing *Doggett*, 505 U.S. at 652 n.1); *accord United States v. Young*, 657 F.3d 408, 414 (6th Cir. 2011) (stating that "[a] court need only consider the other *Barker* factors if there has been 'uncommonly long' delay" and that "a delay of more than one year is presumptively prejudicial and triggers application of the remaining three factors"); *Maples v. Stegall*, 427 F.3d 1020, 1026 (6th Cir. 2005) ("A delay approaching one year is presumptively prejudicial and triggers application of the remaining three factors.").

Ordinarily, "[t]he length of the delay is measured from the date of the indictment or the date of the arrest, whichever is earlier." *Maples*, 427 F.3d at 1026 (citing *United States v. Marion*, 404 U.S. 307, 320 (1971), and *Redd v. Sowders*, 809 F.2d 1266, 1269 (6th Cir. 1987)). Petitioner, therefore, contends that the delay began in June 2009, when he was arraigned, and that the delay ended five years, three months later, on September 24, 2014, when his second trial began. (Pet., ECF No. 1 at Pg. ID 19.)

According to the Michigan Court of Appeals, however, the delay was three years: from September 6, 2011, when Petitioner's first direct appeal ended, to September 24, 2014, the date that Petitioner's second trial began. *See Wilson*, 2016 WL 2731096, at *3. Using September 2011, as opposed to June 2009, as the

16

start of the delay makes sense because the interval between Petitioner's arraignment in 2009 and the amended charging document did not in itself violate the speedy trial provision of the Constitution.  *See United States v. Ewell*, 383 U.S. 116, 121 (1966) (stating that the substantial interval between the defendants' original and subsequent indictments did not in itself violate the speedy trial provision of the Constitution).

Here, during the first appeal of right, the Michigan Court of Appeals vacated Petitioner's initial convictions and sentences, and remanded the case to the trial court for further proceedings.  The prosecutor's appeal from that order was denied by the Michigan Supreme Court on September 6, 2011.  At that point, Petitioner once again became subject to prosecution, and his right to a speedy trial attached. *See United States v. MacDonald*, 456 U.S. 1, 6 (1982) ("A literal reading of the [Sixth] Amendment suggests that th[e] right [to a speedy and public trial] attaches only when a formal criminal charge is instituted and a criminal prosecution begins."); *Marion*, 404 U.S. at 313 (stating that "the protection of the Amendment is activated only when a criminal prosecution has begun and extends only to those persons who have been 'accused' in the course of that prosecution"); *see also Harvey v. Shillinger*, 76 F.3d 1528, 1533–34 (10th Cir. 1996) (concluding that the speedy trial clock for the petitioner's second trial began to run after his original convictions were vacated and he was charged with a new offense).

17

Petitioner, in fact, agreed with the prosecution during the state appellate proceedings that, for purposes of a speedy trial, the clock began to run on September 6, 2011, when the Michigan Supreme Court rejected the prosecution's application for leave to appeal on direct appeal.   He stated that,

> [w]hile normally the length of delay for speedy trial purposes is calculated from the date of arrest to the date of trial, in this matter the relevant period, given the initial appellate reversal of the convictions, runs from the date the Michigan Supreme Court denied leave to appeal to the prosecution from the Court of Appeals' opinion which reversed those convictions and remanded for a new trial (September 6, 2011 – see Appendix B) to the date of the beginning of the re-trial (September 24, 2014).  *See People v Bennett*, 84 Mich. App. 408; 269 N.W.2d 618 (1978).  That delay was in excess of three years.

Def. Brief on Appeal, Mich. Ct. App. No. 324856 (ECF 6-19 at Pg. ID 782).

Petitioner alleges in his habeas petition that he did not authorize his appellate attorney to use September 6, 2011, as the start of the delay period.  (ECF No. 1 at Pg. ID 18).  However, his appellate attorney's argument is consistent with Petitioner's *pro se* motion in state court that the clock should start running in 2011 when his convictions were vacated.  *See* 2/16/12 Pretrial Conference, ECF No. 6-11 at Pg. ID 383-86.)  The Michigan Court of Appeals, therefore, did not unreasonably apply the law or unreasonably determine the facts when it concluded that the pretrial delay began on September 6, 2011.

Nevertheless, because the parties agree that the delay ended on September 24, 2014, the delay was more than one year, and it is presumptively prejudicial. The first factor weighs in Petitioner's favor.

## 2. **Reasons for the Delay**

The second speedy-trial factor requires an assessment of the reasons for the delay. Petitioner alleges that the delay was entirely attributable to the prosecution and to some of the appeals in his case. He claims that he was "railroaded" by the state court of appeals and by the appearance of impropriety. He also contends that the prosecution and courts acted in bad faith or were negligent. (Pet., ECF No. 1 at Pg. ID 19.)

The Michigan Court of Appeals, however, ruled that the reasons for the delay factor did not weigh in Petitioner's favor because (i) the prosecutor's interlocutory appeal on the double jeopardy issue was not frivolous; (ii) Petitioner failed to show bad faith or dilatory purpose on the part of the prosecution; (iii) the double jeopardy issue was important; (iv) the crime was serious; and (v) much of delay before and after the interlocutory appeal was due to Petitioner's motions or requests. *Wilson*, 2016 WL 2731096, at *3-*5.

In *Barker*, the Supreme Court stated that

different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily

19

but nevertheless should be considered since the ultimate responsibility
for such circumstances must rest with the government rather than with
the defendant.  Finally, a valid reason, such as a missing witness, should
serve to justify appropriate delay.

*Barker*, 407 U.S. at 531 (footnote omitted); *see also Brown*, 845 F.3d at 714

(explaining that governmental delays motivated by bad faith, harassment, attempts

to seek a tactical advantage, negligence, and a lack of explanation weigh against

the government, but in varying degrees).  "[T]he court considers who is most at

fault—the government or the defendant."  *Brown*, 845 F .3d at 714.

### a.  September 6, 2011 to July 16, 2012

As noted above, the delay in retrying Petitioner started on September 6,

2011, when the Michigan Supreme Court denied the prosecution's application for

leave to appeal the lower court's order vacating Petitioner's initial convictions and

remanding the case to the trial court.  At a pretrial conference about three months

later, Petitioner objected to being re-tried on a charge of felony-murder because he

was acquitted of home invasion, which was the felony underlying the felony-

murder charge.  (12/13/11 Pretrial Conference, ECF No. 6-9 at Pg. ID 358.)

At another pretrial conference a month later, Petitioner stated that he was

firing his appointed attorney.  (1/19/12 Pretrial Conference, ECF 6-10 at Pg. ID

363-64.)  Petitioner also objected to being moved from a nearby prison to the

county jail because he was trying to defend himself, and the prison law library was

better than the library at the jail.  (*Id*. at Pg. ID 368-69.)  Petitioner's attorney

20

(Jeffery Cojocar) explained the things that he had done on Petitioner's behalf, and he described Petitioner as "confrontational." (*Id*. at Pg. ID 365-68.) The trial court allowed Cojocar to withdraw from the case, and it warned Petitioner that he would be "stuck" with the next appointed attorney. (*Id*. at Pg. ID 371.)

At the next pretrial conference on February 16, 2012, the trial court announced that the newly appointed attorney (Mark Swanson) had declined to represent Petitioner. Although Swanson cited personal family matters for his decision, he also informed the trial court by letter that Petitioner had failed to have a couple of his witnesses call Swanson and that, during a two-hour interview with Petitioner, Petitioner could not give Swanson a straight answer as to whether he wanted to represent himself. (2/16/12 Pretrial Conference, ECF No. 6-11 at Pg. ID 380-81.) The trial court set a trial date of April 24, 2012, and it agreed to appoint one more attorney for Petitioner. (*Id.* at Pg. ID 381-82, 394, 396.) Petitioner then made oral motions for discovery and for appointment of an independent medical examiner, a crime reconstructionist, and a private investigator. The trial court agreed to give Petitioner the available discovery materials, and it took the other motions under advisement. (*Id*. at Pg. ID 396-402.)

At a subsequent pretrial conference, Petitioner asserted his right to a speedy trial. However, when the trial court offered Petitioner an earlier trial date,

Petitioner declined the offer and stated that he wanted to file an interlocutory appeal.  (3/1/12 Pretrial Conference, ECF No. 6-12 at Pg. ID 418-22.)

On April 18, 2012, Petitioner asked for a 90-day adjournment of the trial date because he was not prepared for trial.  He acknowledged that the speedy-trial clock would stop running if an adjournment were granted.  (4/18/12 Pretrial Hr'g, ECF No. 7-2 at Pg. ID 1539-41.)  The trial court then adjourned the trial date to July 17, 2012, so that Petitioner could prepare for trial.  (*Id.* at Pg. ID 1542, 1544-45.)

Finally, on July 6, 2012, the trial court granted Petitioner's motion to dismiss the felony-murder count.  *See People v. Wilson*, No. 09-2637 FC (Macomb Cty. Cir. Ct. July 6, 2012); (ECF No. 6-18 at Pg. ID 671).  The trial was set to start on July 17, 2012, but on July 12, 2012, the prosecution applied for leave to appeal the trial court's dismissal of the felony-murder charge.  On July 16, 2012, the presiding judge of the Michigan Court of Appeals granted the application for leave to appeal, ordered an expedited appeal, and granted a stay.  (ECF No. 6-18 at Pg. ID 698.)[3]

At that point in the proceedings, approximately ten months had run on the speedy trial clock:  from September 6, 2011, to July 16, 2012.  However, at least

---

[3] Appellate Judges Pat M. Donofrio and Deborah A. Servitto voted to grant the motion for immediate consideration and to peremptorily reverse the trial court's ruling.  (ECF No. 6-18 at Pg. ID 698.)

three months of that ten-month period is attributable to Petitioner because he asked to have his appointed attorneys removed from the case and then he requested a ninety-day adjournment of the trial date to prepare for trial. "When a party makes motions, it cannot use the delay caused by those motions as a basis for a speedy-trial claim." *Young*, 657 F.3d at 415 (citing *United States v. Loud Hawk*, 474 U.S. 302, 316-17 (1986) (quoting *United States v. Auerbach*, 420 F.2d 921, 924 (5th Cir. 1969)).

### b.  July 16, 2012 to June 18, 2014

A substantial amount of the pretrial delay was the result of the interlocutory appeal regarding the felony-murder charge and the related double jeopardy issue. As explained above, Petitioner prevailed on the issue in the trial court, but the prosecution appealed the trial court's decision to the Michigan Court of Appeals.

Petitioner claims that the prosecution's appeal of the trial court's dismissal of the felony-murder charge was frivolous and tainted by impropriety because one of the judges that sat on the panel which granted the prosecution leave to appeal was the prosecutor's former stepmother. In addition, according to Petitioner, it is hornbook law that a person cannot be recharged for a crime of which the person has been acquitted by a jury, and he was acquitted of home invasion, the predicate felony for the felony-murder count.

23

"[T]he interests served by appellate review . . . sometimes stand in opposition to the right to a speedy trial." *Loud Hawk*, 474 U.S. at 313.  Thus, "[u]nder *Barker,* delays in bringing the case to trial caused by the Government's interlocutory appeal may be weighed in determining whether a defendant has suffered a violation of his rights to a speedy trial.  *Id.* at 316.  But "an interlocutory appeal by the Government ordinarily is a valid reason that justifies delay." *Id*. at 315.

> In assessing the purpose and reasonableness of such an appeal, courts may consider several factors.  These include the strength of the Government's position on the appealed issue, the importance of the issue in the posture of the case, and—in some cases—the seriousness of the crime.  *United States v. Herman,* 576 F.2d 1139, 1146 (CA5 1978) (Wisdom, J.).  For example, a delay resulting from an appeal would weigh heavily against the Government if the issue were clearly tangential or frivolous.  *Ibid.*  Moreover, the charged offense usually must be sufficiently serious to justify restraints that may be imposed on the defendant pending the outcome of the appeal.  *Ibid.*

*Id*. at 315-316.

Here, the prosecution's position on the double jeopardy issue was far from frivolous.  At the trial court level, the parties agreed that the jury could return a verdict of guilty of felony-murder and not guilty of home invasion and that the prosecution did not have to charge the predicate felony to obtain a conviction.  The issue, however, was whether the prosecution could retry Petitioner on a charge of felony-murder, with home invasion as the predicate felony, even though Petitioner had been acquitted of the predicate felony at his first trial.  The trial court and the

parties were unable to find any Michigan law squarely on point. *People v. Wilson*, No. 09-2637 FC (Macomb Cty. Cir. Ct. July 6, 2012); (ECF No. 6-18 at Pg. ID 671).

Furthermore, the Michigan Court of Appeals ruled in the prosecution's favor on the issue, *see Wilson* 2012 WL 5854885, and when Petitioner appealed to the Michigan Supreme Court, the state supreme court stated that the case "implicate[d] more than one somewhat complex legal doctrine[s]." *Wilson*, 496 Mich. at 95; 852 N.W.2d at136. Three justices of the Michigan Supreme Court agreed with the prosecution's position, *see id.*, 496 Mich. at 108-32; 852 N.W.2d at 142-55, and the United States Supreme Court has since held that the issue-preclusion component of the Double Jeopardy Clause does not bar prosecutors from retrying defendants after a jury has returned irreconcilably inconsistent verdicts of conviction and acquittal, and the convictions are later vacated for legal error unrelated to the inconsistency. *See Bravo-Fernandez v. United States*, 137 S. Ct. 352, 362-63 (2016).

Not only was the prosecution's position on the appealed issue strong, the issue was important to the posture of the case. The prosecution could not proceed with a second trial until there was a determination on whether Petitioner could be charged with felony-murder. Finally, felony-murder was a serious crime, for it is punishable by life imprisonment without the possibility of parole. The Court

concludes that the prosecution was justified in appealing the trial court's ruling on the double jeopardy issue.

Petitioner contends that the prosecutor's interlocutory appeal was tainted because one of the judges on the panel that granted leave to file the interlocutory appeal was the former stepmother of the prosecutor who tried Petitioner the second time.  But the prosecutor who re-tried Petitioner was not involved in Petitioner's case at the time of the interlocutory appeal.  And the judge in question did not sit on the appellate panel that issued the decision overturning the trial court's dismissal of the felony-murder charge.

Petitioner, nevertheless, asserts that the Michigan Supreme Court took an unreasonable amount of time in deciding his subsequent appeal to the Michigan Supreme Court after the Court of Appeals reinstated the felony-murder charge. Petitioner's appeal was meritorious in that he ultimately prevailed on the issue in the Michigan Supreme Court.  But to prevail on a speedy trial claim, a defendant who files a meritorious appeal bears the burden of showing that the prosecution caused an unreasonable delay in that appeal or that the appellate court's delay was "wholly unjustifiable." *Loud Hawk*, 474 U.S. at 316.

The Michigan Supreme Court took almost eighteen months to decide the double jeopardy issue.  Nevertheless,

> because of the many procedural safeguards provided an accused, the
> ordinary procedures for criminal prosecution are designed to move at a

> deliberate pace. A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself.

*Ewell*, 383 U.S. at 120. Therefore, "[t]he right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice." *Beavers v. Haubert*, 198 U.S. 77, 87 (1905).

In the present case, the Michigan Supreme Court invited the Prosecuting Attorneys Association of Michigan and the Criminal Defense Attorneys of Michigan to file briefs amicus curiae in the case. *See People v. Wilson*, 494 Mich. 853; 830 N.W.2d 384 (2013). The court's dispositive opinion followed eight months after all the briefs were submitted, and the majority opinion was accompanied by a lengthy dissenting opinion.

Furthermore, "[t]he opinion in *Loud Hawk* . . . makes it clear that the question is not whether the appellate court's delay was reasonable or unreasonable. The issue is whether the review taken by the appellate court constituted a 'wholly unjustifiable' delay." *Deblase v. Roth*, No. CIV. A.95-5473, 1996 WL 11303, at *6 (E.D. Pa. Jan. 10, 1996) (unpublished). Additionally,

> the public has a strong interest in thorough and comprehensive appellate reviews. Thus, appellate courts, particularly State Supreme Courts, employ a slower and more deliberate process due to the nature of the legal issues brought before the court and the impact that its decision will have on the entire State and not just the current case at bar.

*Id.* at *7.

It is not lost upon the Court that *Loud Hawk* does not provide guidance on what "wholly unjustifiable" means and, in the 34 years since that case issued, neither the United States Supreme Court nor any circuit court has provided any instruction to fill in the gap.  *See generally Loud Hawk*, 474 U.S. at 316.  Nor has the Court ignored the fact that the Michigan Supreme Court underwent a very lengthy consideration of his interlocutory appeal and, in reality, Petitioner "is not privy to the inner workings or the deliberative processes" of the Michigan Supreme Court.  *See Com. v. DeBlase*, 542 Pa. 22, 35, 665 A.2d 427, 434 (1995).  Still, Petitioner is not absolved of the burden of showing a "wholly unjustifiable" delay by the appellate court.  Absent guidance from the Supreme Court, the Court cannot conclude that the state court's finding that Petitioner failed to clear this high hurdle was contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable application of the facts.

### c.  June 18, 2014 to September 24, 2014

The remaining portion of the pretrial delay consisted of the three-month period following the interlocutory appeal:  from June 18, 2014, when the Michigan Supreme Court issued its decision on the double jeopardy issue, until September 24, 2014, when Petitioner's second trial commenced.  During that time, Petitioner filed more motions, including a motion to disqualify the trial court.  He contends

that the motions were necessary because the prosecution withheld or destroyed discovery materials, but there is no indication in the record that the delay in producing discovery was the result of bad faith by the prosecution.

Even if the prosecution was negligent in producing discovery and the three-month delay following the interlocutory appeal were weighed against the Government, the total time attributed to the prosecution was, at most, ten months (seven months before the interlocutory appeal and three months after the interlocutory appeal).  The remaining portion of the three-year delay was due to the interlocutory appeal on the double jeopardy issue (23 months), which was not frivolous, and Petitioner's request for an adjournment of the trial (three months), which was attributable to Petitioner.  As such, the reasons for the delay weigh against Petitioner and in favor of the Government.

### 3.  Assertion of the Right

The third *Barker* factor requires asking whether the defendant asserted his right to a speedy trial, because "a defendant has some responsibility to assert a speedy trial claim[.]"  *Barker*, 407 U.S. at 529.  The parties in this case do not dispute that Petitioner requested a speedy trial.  (*See* Pet. for Writ of Habeas Corpus, ECF No.1 at Pg. ID 25-27; Resp. Answer in Opp'n to Pet.*,* ECF No. 5 at Pg. ID 146.)  The record, moreover, demonstrates that Petitioner repeatedly moved

for a speedy trial.  (*See, e.g.*, 2/16/12 Pretrial Conference, ECF No. 6-11 at Pg. ID 383-89; 3/1/12 Pretrial Hr'g, ECF No. 6-12 at Pg. ID 408, 417; 4/17/12 Proceeding, ECF No. 7-1 at Pg. ID 1490-91; 2/13/13 Pretrial Conference, ECF No. 7-4 at Pg. ID 1617, 1621-22; 8/4/14 Proceeding, ECF No. 7-11 at Pg. ID 1705-06.)  The third factor weighs in Petitioner's favor.

### 4.  Prejudice

The fourth *Barker* factor is prejudice to the defendant.  The Michigan Court of Appeals evaluated this factor and concluded that Petitioner was not prejudiced by the delay in trying him.  The Court of Appeals stated that (i) Petitioner received credit for the time he was incarcerated before trial, (ii) his anxiety alone was insufficient to establish a speedy trial claim, and (iii) Petitioner conceded on appeal that no witnesses became unavailable, and no documents were lost.  (ECF No. 6-23 at Pg. ID 1288.)

Petitioner, nevertheless, points out that he remained incarcerated during the entire pretrial delay.  In addition, he was not able to groom himself properly during his incarceration, and he suffered constant anxiety and concern about his family, his financial status, and his career.  (Pet., ECF No.1 at Pg. ID 27-28.)  Petitioner also contends that he suffered prejudice to his defense because witnesses during his second trial experienced loss of memory.  (*Id.* at Pg. ID 28.)

There are "societal disadvantages" to a lengthy pretrial incarceration.  As explained in *Barker*:

> The time spent in jail awaiting trial has a detrimental impact on the individual.  It often means loss of a job; it disrupts family life; and it enforces idleness. . . .  Moreover, if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense.

*Barker*, 407 U.S. at 532-33; *see also Marion*, 404 U.S. at 320 (stating that "[i]nordinate delay between arrest, indictment, and trial may impair a defendant's ability to present an effective defense," and that an arrest may "disrupt [a defendant's] employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends").

But "deprivation of the right to speedy trial does not per se prejudice the accused's ability to defend himself." *Barker*, 407 U.S. at 521.  Instead,

> [p]rejudice . . . should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect.  [The Supreme] Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.  Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.  If witnesses die or disappear during a delay, the prejudice is obvious.  There is also prejudice if defense witnesses are unable to recall accurately events of the distant past.

*Id*. at 532 (footnote omitted).

Petitioner likely "was prejudiced to some extent by living . . . under a cloud of suspicion and anxiety."  *Id*. at 534; *but see Miles v. Jordan*, No. 19-5340, 2021 WL 710955, at *6-7 (6th Cir. Feb. 24, 2021) (affirming district court's determination that 21-month delay between indictment and delay did not prejudice the petitioner, where there was no indication that his anxiety was "beyond that which is inevitable in a criminal case").  But there is some basis in the record for concluding that he did not want a speedy second trial and that he asserted his right to a speedy trial because he hoped that the charges against him would be dismissed for failure to grant him a speedy trial.  For example, at a court proceeding that followed the dismissal of the original charges, Petitioner stated, "I know how this Court likes to zoom things along, and get me in trial, so I'm trying to slow it down now. . . ."  (1/19/12 Proceeding, ECF No. 6-10 at Pg. ID 364.)

At a hearing about a month and a half later, Petitioner said that he was not trying to help everyone hurry up and try him.  (3/1/12 Proceeding ECF No. 6-12 at Pg. ID 418.)  And when the trial court offered Petitioner an earlier trial date, Petitioner declined the offer, stated that he was not ready for trial, and indicated that he planned to file an interlocutory appeal.  (*Id*. at Pg. ID 418-26.)  He subsequently filed an interlocutory appeal based on the speedy-trial issue.  (ECF No. 6-16 at Pg. ID 539-40.)

The delay in trying Petitioner a second time also does not appear to have hindered his defense.  He produced sixteen witnesses in his own defense.  (*See* 10/2/14 Trial Tr., ECF No. 7-20 at Pg. ID 3132; 10/3/14 Trial Tr., ECF No. 7-21 at Pg. ID 3316-17; 10/6/14 Trial Tr., ECF No. 10-6 at Pg. ID 4300; 10/7/14 Trial Tr., ECF No. 7-22 at Pg. ID 3526.)

Petitioner cites to numerous places in the transcript of the trial where witnesses indicated that they did not remember some aspect of the case.  (*See* Pet., Ex. F, ECF No. 1-1 at Pg. ID 107.)  Katherine Horton, the alleged victim of the assault, stated over and over that she did not recall certain details about the incident, but Petitioner's cross-examination of her focused mainly on the most serious charges against him (second-degree murder and assault with intent to do great bodily harm less than murder), crimes for which he was acquitted.  In addition, he was able to cross-examine the unlawful imprisonment victims.  And because the unlawful imprisonment victims were government witnesses, contrary to Petitioner's assertion, their "inability . . . to remember particular facts . . . did not undermine his defense; rather, it weakened the prosecution's case."  *Brown*, 845 F.3d at 719 (quoting *United States v. Schreane*, 331 F.3d 548, 558 (6th Cir. 2003) ("If the witnesses support the prosecution, its case will be weakened . . . [as] it is the prosecution which carries the burden of proof." (quoting *Barker*, 407 U.S. at 521))).  Therefore, "the partial memory lapses" of these two witnesses, "which

33

defense counsel was free to highlight during trial, worked to the advantage of [Petitioner]." *Id*. And though Petitioner contends that their memory loss hindered his ability to cross-examine them (*see* ECF No. 1 at Pg. ID 28-29; ECF No. 8 at Pg. ID 3859), Petitioner does not explain how this was the case. The Court further notes, as to the unlawful imprisonment victims, several of the examples to which Petitioner points do not indicate any memory loss; several other examples concern minor and insignificant details; on many occasions, they did in fact give substantive answers to specific questions after initially stating they could not recall; and Petitioner crossed examined them extensively regarding the details of prior written and video statements, repeatedly referring to them to refresh their recollection and point out inconsistencies. (9/26/14 Trial Tr., ECF No. 7-16 at Pg. ID 2521, 2536-37, 2540, 2542-45, 2548, 2550-59, 2561; 9/26/14 Trial Tr., ECF No. 7-17 at Pg. ID 2601-02, 2604, 2607-08, 2614-15, 2617-18, 2620, 2634, 2638-39, 2645-47, 2649-50, 2659, 2661.) Moreover, their presence at trial as testifying witnesses gave the jury the opportunity to assess their demeanor and whether any credibility should be given to their testimony.

Eight additional witnesses—some who testified on behalf of the Government and others on behalf of the defense—stated at some point in their testimony that they did not recall certain facts. But the things that they could not recall concerned

minor, insignificant details about the case.[4]  *Cf. Brown*, 845 F .3d at 714

(describing the memories of two witnesses as "not so dim" because they

"recall[ed] many *salient* details" (emphasis added)).  In the end, the witnesses'

"lapses of memory . . . were in no way significant to the outcome" of the

Petitioner's trial.  *Barker*, 407 U.S. at 534.  Factor four weighs in the

Government's favor because Petitioner has not shown that he was prejudiced by

the pretrial delay.

Even if one were to assume that the prosecution was more to blame,

Petitioner was responsible for some of the delay, and he has not shown that his

defense was impaired.   Moreover, the Court recognizes that "[t]he time spent in

jail awaiting trial has a detrimental impact on the individual.  It often means loss of

a job; it disrupts family life; and it enforces idleness. . . ."  *Barker*, 407 U.S. at 532-

33.  Indeed, "[t]he time spent in jail is simply dead time."  *Id.*  In this case,

however, the "anxiety and concern" Petitioner experienced was not "beyond that

which is inevitable in a criminal case." *Miles*, 2021 WL 710955, at *6-7.  And

even though Petitioner at one point states in his habeas petition that "[he] was

oppressively incarcerated throughout the delays," Petitioner makes no attempt to

---

[4] (*See* Pet., Ex. F, ECF No. 1-1 at Pg. ID 107 (citing 10/1/14 Trial Tr., ECF No. 7-19 at Pg. ID 3006, 3010-11; 10/2/14 Trial Tr., ECF No. 7-20 at Pg. ID 3227, 3230, 3235, 3241, 3244; 10/3/14 Trial Tr., ECF No. 7-21 at Pg. ID 3432; 3434-35, 3446, 3451-52).)

explain *how* he experienced "oppressive pretrial incarceration" as defined by the
Supreme Court.  *See also McPherson v. Kelsey*, 125 F. 3d 989, 995-96 (6th Cir.
1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some
effort at developed argumentation, are deemed waived.  It is not sufficient for a
party to mention a possible argument in the most skeletal way, leaving the court to
. . . put flesh on its bones."); *see also United States v. Felix*, No. 20-3201, 2021
WL 1102304, at *6 (6th Cir. Mar. 23, 2021) (emphasis in original) (quoting *Young*,
657 F.3d at 418)) (concluding that, where "[t]he only prejudice advanced by [the
petitioner] [] is his pretrial incarceration," the petitioner has not demonstrated
prejudice "with specificity" sufficient to demonstrate oppressive pretrial
incarceration).

## IV.  Conclusion

Factors one and three (length of the delay and assertion of the right) weigh
in Petitioner's favor, but factors two and four (reasons for the delay and prejudice)
favor the Government.  Therefore, the state appellate court reasonably determined
that the delay in bringing Petitioner to trial did not violate the Constitution.  *See*
*Brown v. Bobby*, 656 F.3d 325, 337 (6th Cir. 2011) (reaching the same conclusion
in similar circumstances where factors one and three favored the petitioner, but
factors two and four weighed in the state's favor).

36

The state appellate court's adjudication of Petitioner's claim on the merits was not so lacking in justification that there was an error beyond any possibility for fairminded disagreement.  Further, the state court's decision was not contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable application of the facts.  Accordingly, Petitioner is not entitled to relief on his claim.

## ORDER

**IT IS ORDERED** that the petition for a writ of habeas corpus is **DENIED**. Nevertheless, because reasonable jurists could find the Court's assessment of Petitioner's constitutional claim debatable,

**IT IS FURTHER ORDERED** that a certificate of appealability may issue.

**IT IS FURTHER ORDERED** that Petitioner's motion for bond pending a decision on the habeas petition (ECF No. 15) is **DENIED** as moot.

**IT IS FURTHER ORDERED** that Petitioner's motion for a hearing on the previous judge's recusal (ECF No. 22) is **DENIED** as unnecessary and irrelevant.

**IT IF FURTHER ORDERED** that Petitioner's motion for permission to file a supplemental brief related to his motion for bond (ECF No. 23) is **GRANTED**. No further action is necessary because Petitioner already filed two supplemental briefs (ECF Nos. 24, 26) and the Court has reviewed them.

**IT IS FURTHER ORDERED** that Petitioner's motion to expedite bond due to Petitioner's medical condition (ECF No. 28) is **DENIED** as moot.

**IT IS FURTHER ORDERED** that Petitioner's motion for leave to be heard on pending bond motion (ECF No. 29) is **DENIED** as moot.

**IT IS SO ORDERED**.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: March 31, 2021